UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

OMAR J. SMITH,

      Plaintiff,

v.                Case No. 20-cv-790-pp

NATHAN TAPIO, TYA HAUGE,
and JANE DOE,

      Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), SCREENING COMPLAINT UNDER 28 U.S.C. §1915A AND DISMISSING CASE**

Omar Smith, an inmate at Waupun Correctional Institution who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his rights under federal and state law. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 2, and screens his complaint, dkt. no. 1.

I. **Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 2)**

The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was a prisoner when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA allows the court to give a prisoner plaintiff the ability to proceed with his case without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the prisoner must pay an initial partial filing fee. 28 U.S.C.

1

§1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On May 27, 2020, the court ordered the plaintiff to pay an initial partial filing fee of $41.61. Dkt. No. 5. The court received that fee on June 25, 2020. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

**II.     Screening the Complaint**

    A.     <u>Federal Screening Standard</u>

Under the PLRA, the court must screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). <u>See</u> <u>Cesal v. Moats</u>, 851 F.3d 714, 720 (7th Cir. 2017) (citing <u>Booker-El v. Superintendent, Ind. State Prison</u>, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face."

2

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B. The Plaintiff's Allegations

The plaintiff asserts that, on July 9, 2017, he hurt his right thumb while attempting a backflip during outside recreation. Dkt. No. 1 at ¶11. He says that he was able to "pull his thumb back to touch his forearm and there was a hard protrusion inside the lower thumb that did not break the skin." Id. at ¶12. The plaintiff explains that he didn't immediately file a Health Services request because he thought that he could treat the injury with ice. Id. at ¶12. On July 28, 2017, however, he was still in pain and the protrusion hadn't gone away, so

3

he filed a Health Services Request indicating that he believed he'd torn the tendon between his thumb and forefinger. Id. at ¶13.

About a week later, on August 3, 2017, nurse Gail Walt (who is not a defendant) examined the plaintiff and noted that "the hard protrusion on [the plaintiff's] thumb was a 'bony prominence' and that [the plaintiff] was experiencing pain and difficulty grasping and holding things." Id. at ¶14. Walt didn't treat the plaintiff, but she scheduled him to be seen by the advanced care provider within thirty days. Id. at ¶15.

Less than a week later, on August 8, 2017, defendant Advanced Prescriber Nurse Practitioner (APNP) Nathan Tapio examined the plaintiff and ordered x-rays for the plaintiff's wrist and hand. Id. at ¶¶16-17. The plaintiff explains that he told Tapio that he was having issues with his thumb, not his wrist or hand, but alleges that Tapio told the plaintiff he was "more worried about [the plaintiff's] wrist and hand." Id. at ¶18. According to the plaintiff, Tapio gave him a spica splint for his wrist and thumb, but it was missing the thumb strap to stabilize the thumb. Id. at ¶19. When the plaintiff questioned Tapio about the missing strap, Tapio allegedly told him that "because Tapio was worried about [the plaintiff's] wrist" the plaintiff "could just wrap some tape around it," though Tapio did not provide the plaintiff with tape. Id. at ¶20.

The plaintiff asserts that, from August 8, 2017 until December 20, 2017, no one evaluated his thumb or performed an x-ray. Id. at ¶21. On December 20, 2017, the plaintiff saw Tapio for a follow-up appointment on a different issue. Id. at ¶22. The plaintiff asserts that he informed Tapio that no one had

performed the x-rays that had been ordered months before. Id. at ¶23. Tapio allegedly reordered the x-rays for the plaintiff's wrist and hand. Id. at ¶24. The plaintiff asserts that he again told Tapio that the problem was with his thumb, not his wrist and hand; however, Tapio allegedly told the plaintiff, "I know what I'm doing." Id. at ¶25. The same day, Tapio ordered two MRIs for other issues the plaintiff was having and allegedly told the plaintiff that he would also order an MRI for the plaintiff's thumb. Id. at ¶26. The plaintiff asserts that Tapio also ordered physical therapy for his thumb. Id.

About a week later, on December 26, 2017, defendant Jane Doe x-ray technician of the Health Services Unit performed x-rays of the plaintiff's wrist and hand. Id. at ¶27. The plaintiff asserts that he told Doe that his thumb needed to be x-rayed, not his wrist or hand, and he allegedly showed her the bony protrusion. Id. at ¶28. She allegedly responded that she could only x-ray what she was told to x-ray. Id.

The plaintiff explains that Tapio did not discuss the x-ray results with him until about six weeks later, on February 15, 2018, during a health services visit for a different injury. Id. at ¶29. The plaintiff asserts that the x-rays showed no abnormalities of his wrist or his hand. Id. at ¶30.

The plaintiff says that he began physical therapy about three weeks later, on March 7, 2018. Id. at ¶31. According to the plaintiff, the physical therapist (who is not a defendant) made an initial assessment that the plaintiff "had ligament laxity and hyper mobility of the metacarpal-phalanges joint of his right thumb." Id. at ¶32. The plaintiff asserts that the physical therapist told

5

him the therapist thought the ligaments in the plaintiff's thumb were torn. Id. at ¶33. He allegedly showed the plaintiff some exercises to strengthen the muscles between his thumb and forefinger. Id.

The plaintiff says that a few weeks later, on March 29, 2018, he went to Waupun Memorial Hospital for MRI screenings, but no MRI was taken of his thumb. Id. at ¶ 34. A few days after that, the plaintiff wrote an information request inquiring why no MRI was taken of his thumb. Id. at ¶35. According to the plaintiff, rather than answering his question, Tapio informed the plaintiff that Tapio did not have the results of the screenings that had been done. Id.

A few weeks after that, on April 18, 2018, the physical therapist ordered a splint to stabilize the plaintiff's thumb. Id. at ¶36. The plaintiff explains that a little over a week later, on April 29, 2018, he filed a grievance about the allegedly inadequate treatment and care he was receiving for his thumb and the alleged failure to diagnose the problem before ordering treatment. Id. at ¶37. The physical therapist gave him the splint a couple of days later, on May 2, 2018. Id. at ¶38.

The next day—May 3, 2018—Tapio allegedly called the plaintiff to health services and informed him that he was ordering a consultation for the plaintiff with a hand surgeon. Id. at ¶39. The plaintiff states that two months later he wrote Tapio an information request asking why he had not been sent out to see the hand surgeon. Id. at ¶40. The plaintiff asserts that Tapio responded to him that it depended on the doctor's availability. Id.

6

The plaintiff went to UW Hospital on September 26, 2018, where his thumb was x-rayed. Id. at ¶41. Dr. Matthew Nies (who is not a defendant) examined the plaintiff's thumb and determined that the ulnar collateral ligament was torn. Id. at ¶42. After reviewing the x-ray, Nies told the plaintiff that the bony prominence was "an avulsion where the bone broke away when the ligament tore." Id. at ¶43. According to the plaintiff, Dr. Nies recommended that the plaintiff's institution schedule a surgery for the plaintiff's thumb to be reconstructed. Id. at ¶44.

The plaintiff says that on October 16, 2018, he was called to health services to be fitted for a thumb splint. Id. at ¶45. The plaintiff asserts that Tapio ordered the splint even though he knew the plaintiff had received a splint months earlier. Id. The plaintiff suspected that Tapio was trying to cover up his poor treatment decisions, so the plaintiff filed a grievance. Id. at ¶¶45-46.

The plaintiff explains that five months later, on March 13, 2019, he went to UW Hospital for a follow-up for his thumb. Id. at ¶47. According to the plaintiff, the doctor (who is not a defendant) told the plaintiff that he did not need a follow-up because he had already been recommended for surgery. Id. at ¶48. The plaintiff asserts that the doctor checked the surgery schedule and informed the plaintiff that as of that day, the plaintiff had not been scheduled for surgery. Id. at ¶49. The doctor allegedly wrote to health services and told staff that the plaintiff did not need any more follow-up appointments; he just needed to be scheduled for surgery. Id. at ¶50.

7

The plaintiff states that the next day, he wrote to health services and asked why he had been sent to the hospital. Id. at ¶51. Health services allegedly informed him that he was supposed to have been sent for a different issue, but the write-up mistakenly indicated it was for his thumb. Id.

The plaintiff asserts that about three months later, on June 7, 2019, he had reconstruction surgery on his thumb. Id. at ¶52. This was twenty-three months after he injured the thumb and nine months after surgery had been recommended. Id. The plaintiff asserts that "throughout the entire duration of that twenty-three months [he] suffered the pain of trying to use his dominant hand to grab and hold things and perform everyday activities with the injury to his thumb." Id.

    C.    Analysis

"[T]he Eighth Amendment, as the Supreme Court has interpreted it, protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). The court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment. The court considers: 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the individual defendant was deliberately indifferent to that condition." Id. (quoting Petties v. Carter, 836 F.3d 722, 727-28 (7th Cir. 2016) (*en banc*)). "In applying this test, [the court] look[s] at the totality of an inmate's medical care

when considering whether the care evidences deliberate indifference to serious medical needs." Lisle v. Welborn, 933 F.3d 705 (7th Cir. 2019).

The plaintiff's allegations about his thumb injury are enough for the court to reasonably infer that he suffered from an objectively serious medical condition, but the court cannot reasonably infer from his allegations about the defendants' responses to his injury that they were deliberately indifferent to his condition.

The plaintiff alleges that in response to his complaints about his thumb, Tapio ordered x-rays for the plaintiff's hand and wrist on August 8, 2017. When, months later, Tapio learned from the plaintiff that the x-rays hadn't happened, he reordered the x-rays, ordered an MRI of the plaintiff's thumb and referred the plaintiff to physical therapy. Again, months later, after the plaintiff complained that his thumb injury was not being addressed, Tapio ordered a consult with a hand surgeon, who recommended surgery. Tapio apparently adopted the surgeon's recommendation because, eventually, the plaintiff had surgery on his thumb. Looking at the totality of the care the plaintiff himself says he received, Tapio made consistent efforts to diagnose and treat the plaintiff's injury, thus satisfying his obligations under the Constitution. See Wilson v. Adams, 901 F.3d 816, 821-22 (7th Cir. 2018).

The plaintiff disagrees with Tapio's initial decision to order x-rays of his hand and wrist rather than his thumb, but "[n]either medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment." Berry v.

9

Peterman, 604 F.3d 435, 441 (7th Cir. 2010); Lockett v. Bonson, 937 F.3d 1016, 1023 (7th Cir. 2019). Tapio informed the plaintiff that he was concerned about the plaintiff's wrist and hand. The fact that the plaintiff did not share this concern does not support a conclusion that Tapio was deliberately indifferent to the plaintiff's condition. (Also, it's not clear why an x-ray of the plaintiff's hand would not include images of the plaintiff's thumb—which is part of his hand.)

There was significant delay in addressing the plaintiff's injury, but the court cannot reasonably infer from the plaintiff's allegations that *Tapio* was responsible for the delays. See Vance v. Peters, 97 F.3d 987, 991 (7th Cir.1996) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.") (internal quotation marks and citation omitted). According to the plaintiff, Tapio was responsive every time the plaintiff raised concerns about his injury and treatment. Each time the plaintiff complained, Tapio ordered additional diagnostic tests and treatments and made referrals to other providers. The plaintiff's allegations do not suggest that Tapio had any responsibility for fulfilling Tapio's own orders (for example, for scheduling the ordered referrals or perform the diagnostic tests). His responsibility as the plaintiff's treating provider was to place the orders, which is what he did. The plaintiff has not stated sufficient facts to allow him to proceed on an Eighth Amendment claim against Tapio.

10

The plaintiff also fails to state an Eighth amendment claim against Tya Hague. In the section of his complaint where he identifies the parties, the plaintiff alleges that Hague was "responsible for scheduling off-site hospital visits." Dkt. No. 1 at ¶5. This is the only time the plaintiff mentions Hague in the complaint. He does not state what he believes Hague did or did not do to violate his rights. Maybe the plaintiff believes that the delays in the scheduling of texts or surgery were because of Hague. The court has no idea, because the plaintiff does not say so. Maybe he believes Hague was responsible for him being sent to the hospital for a follow-up appointment on his thumb even though no follow-up was necessary. Dkt. No. 47 at ¶¶47-51. The plaintiff explains that he questioned why the appointment was scheduled, and health services responded that it was a mistake. He was supposed to be sent for other reasons, but his thumb injury was mistakenly listed as the reason. Such a mistake may support a negligence claim, but "[n]egligent conduct on the part of a state official is insufficient to make out a constitutional violation." Worlds v. Spiegla, 277 F. App'x 625, 627 (7th Cir. 2008). The plaintiff has not stated sufficient facts to allow him to proceed on an Eight Amendment claim against Hague.

Nor has the plaintiff stated an Eighth Amendment claim against the Jane Doe x-ray tech who x-rayed the plaintiff's wrist and hand as Tapio ordered (rather than the plaintiff's thumb as the plaintiff requested). The Jane Doe technician explained to the plaintiff that she could x-ray only what the treating provider had ordered. The fact that plaintiff disagreed with the order did not

11

require the technician to deviate from or question the order. She was entitled to defer to Tapio's professional opinion that the plaintiff's hand and wrist should be x-rayed. See Holloway v. Delaware Cty. Sheriff's Office, 700 F.3d 1063, 1075 (7th Cir. 2012) ("[N]urses may generally defer to instructions by physicians" unless "it is apparent that the physician's order will likely harm the patient.").

Because the plaintiff has not stated constitutional claims against the defendants, the court declines to exercise jurisdiction over the plaintiff's medical malpractice claims, which arise under state law. 28 U.S.C. §1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .") If the plaintiff wants to pursue his medical malpractice claims, he may do so in state court.

### III. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **ORDERS** that this case is **DISMISSED** because the complaint fails to state a federal claim and because the court declines to exercise jurisdiction over the state law claims.

The court **ORDERS** that the agency that has custody of the plaintiff shall collect from his institution trust account the $308.39 balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the

amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency shall clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution shall forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the officer in charge of the agency where the plaintiff is confined.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within thirty days of the entry of judgment. See Fed. R. of App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within twenty-eight days of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and

determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 8th day of July, 2020.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**